

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
Richmond Virginia

LEE SCHOOL LOFTS, L.L.C.,

    Plaintiff,

v.                       Civil Action No. 3:08cv427

AMTAX HOLDINGS 106 LLC,
et al.,

    Defendants.

### MEMORANDUM OPINION

The Plaintiff, Lee School Lofts, L.L.C., ("Lee School") has filed this diversity action seeking specific performance and declaratory and other relief under Virginia law against Amtax Holdings 106, L.L.C. ("Amtax") and Protech 2002-A, L.L.C. ("Protech") (the "Defendants"). The Defendants have also filed a three-count counterclaim seeking: (1) declaratory relief; (2) reformation; and (3) declaratory and injunctive relief due to Lee School's alleged violation of the Partnership Agreement and Deed of Trust.

This issue is now before the Court on the Defendants' Motion for Summary Judgment (Docket No. 58). The Defendants' motion seeks summary judgment on Counts I, II and V of the Amended Complaint, as well as on Counts I and

1

III of their counterclaim. For the reasons set forth below, the motion will be granted in part and denied in part.

## BACKGROUND

Lee School Lofts is an apartment complex, which was converted from a former elementary school. It is located in Richmond, Virginia. Lee School and the Defendants are partners in Lee School Lofts, L.P., a partnership that owns the complex (the "Partnership"). Defs' Mot. at 1. The Plaintiff is the sole general partner of the Partnership and also serves as the "Managing General Partner." Id. at 2. Amtax Holdings and Protech serve as the "Investor Limited Partner" and the "Special Limited Partner No. 1," respectively. Id. Lee School, as the Managing General Partner, owns only 0.08% of the Partnership. Id. Protech, as the Special Limited Partner No. 1, owns only .01% of the Partnership. Id. Amtax, as the Investor Limited Partner, contributed approximately $1 million to the Partnership and owns 99.9% of the interest in the Partnership.1 Id.

The history of the Partnership is somewhat complex. But, to properly understand the issues in the case, it is necessary to articulate that history. In 2001, the City of

---

1 The remaining .01% of the interest in the Partnership is unaccounted for in the briefing submitted by the parties.

2

Richmond selected the Partnership to convert the former Robert E. Lee Elementary School into housing. The Partnership, through Lee School, solicited investors for the project. Id. One of those potential investors was the Paramount Financial Group, Inc. ("Paramount"). Id. The Partnership and Paramount executed a letter in October 2001 in connection with their negotiations (the "Investment Agreement"). In some fashion not clear from the record, there was a connection between Amtex, Protech, and Paramount at that time, but Amtex and Protech were not signatories to the Investment Agreement, nor where they specifically mentioned in the Agreement. Id. at 3. Moreover, as conceded by Lee School at oral argument, there is no indication that Paramount was acting as an agent for either Amtex or Protech at the time that Paramount signed the Investment Agreement.

The Investment Agreement "set out certain business terms that must be agreed upon" so that an operating agreement between Lee School and Paramount could be formed. Id. at 3. The Investment Agreement further provided that the "General Partner shall have the option to purchase from the Limited Partner the Limited Partner's interest in the Partnership, the real estate, fixtures, and the personal property comprising the Apartment Complex." Id. at 4. At

Lee School's request, the Investment Agreement also stated that the option price shall be an amount, as determined by the Partnership's accountants, "sufficient to enable the Investment Partnership to pay any taxes imposed on any such distribution," or "[o]ne hundred percent (100%) of the fair market value of the Limited Partner's interest based upon [the] formula attached herein." Id. at 6. There was, however, no physical attachment to the Agreement. Id. at 6.

The Partnership itself exists by virtue of an Amended and Restated Agreement of Limited Partnership ("LPA"), which was executed by the parties in January 2002. Id. at 3. The Defendants first became limited partners in the Partnership with Lee School pursuant to the execution of the LPA. Id. Through their attorneys, the parties proposed numerous edits to the LPA, and eleven different versions of the LPA were produced over the course of the negotiation period. Id.

After the execution of the LPA, Paramount's interests in Amtax and Protech were sold to Capmark Affordable Properties, Inc. ("Capmark"). Id. at 6. Capmark then sold those interests to Wentwood Capital ("Wentwood") in 2008. Id. At oral argument, counsel for the Defendants clarified that this transferred "interest" was a "management"

4

interest in Amtax and Protech, and was not an interest in the companies themselves.

The LPA, *inter alia*, provides that: (1) "the General Partner may purchase the partnership interest of the Investor Limited Partner and the Special Limited Partner No. 1" at a price dictated by Section 7.4(I) of the LPA; and (2) the rights and obligations under the LPA shall be enforceable by "specific performance, injunction, or other equitable remedy." See id. Section 7.4(I) of the LPA, which is the basis for the dispute in this action, is an "option provision" that gives Lee School the right to purchase certain interests of the Defendants at the end of a tax-credit abatement period. Id. at 4. Specifically, the relevant portions of § 7.4(I) concern: (a) the interests that Lee School is entitled to purchase; and (b) the applicability of the formula set forth in the option provision. Id.

In many respects, the provisions of the LPA tracked the provisions of the Investment Agreement. Significantly, however, the LPA set forth a detailed option provision, providing that the purchase price:

> [S]hall equal . . . 100% of the fair market value of the Investor Limited Partner's and Special Limited Partner No. 1 interest in the Partnership as determined by the value of the interest if the Project owned by Partnership was sold for an

5

amount equal to nine (9) times (determined based on appraisal information and the representation of the Managing General Partner of Partnership that a capitalization rate of 11% is reasonable for comparable sales) its projected net operating income, as mutually agreed to, for the twelve months during which the Managing General Partner gives notice of its intent to exercise this option (treating Partnership management and administrative expenses up to an amount of 8% gross cash receipts as expenses incurred in arriving at net Operating Income), less all customary costs incurred in such a sales transaction, including a 4% brokerage fee . . . .

LPA § 7.4(I).2 The LPA also defined what could be purchased. In pertinent part, the LPA provides that Lee School, as Managing General Partner, "shall have the option to purchase the interest of the Investor Limited Partner and Special Limited Partner No. 1 in the real estate, fixtures and personal property comprising the Apartment Complex." Id.

After the execution of the LPA, the school was converted to apartments. Under the applicable tax-credit statute, the complex could not be converted into condominiums for a period of five years. That timeframe began contemporaneously with the physical conversion of the school building into an apartment complex.

---

2 In 2003, the Partnership borrowed approximately $4.3 million from Principal Life Insurance Company ("Principal") for additional construction funds. Id. at 7. The loan with Principal resulted in an amendment to the LPA that added certain provisions and corrected certain errors. This amendment, however, made no substantive changes to § 7.4(I) of the LPA. See id.

The zoning classification of the project is an "R-6 single-family attached residential district;" a classification which prohibits multi-family dwellings. Id. at 8. Accordingly, the project was required to obtain a special use permit ("SUP") to begin the construction process. Id. The SUP contains the following requirement: "Within five (5) years of the issuance of the certificate of occupancy for the entire building, all of the dwelling units shall be converted to condominiums." Id. The SUP further provides that failure to comply with its terms "shall constitute a violation of section 32.1-1080 of the Code of the City of Richmond, 1993." Id. The certificate of occupancy for the project was issued in November 2002. Under the SUP, therefore, the deadline for converting the units to condominiums was November 2007. Id.

However, instead of converting the project to condominiums within the time period required by the SUP, Lee School waited until the tax-abatement period ended in 2008 to begin the conversion process. Id. at 9. On March 31, 2008, Lee School gave notice to the Defendants that it intended to exercise its purchase rights under § 7.4(I) of the LPA. Pursuant to the formula established in § 7.4(I) of the LPA, Lee School stated that it intended to purchase the Defendants' partnership interests for $0,

notwithstanding the fact that all of the parties have agreed that the fair market value of the Defendants' partnership interests is approximately $2 million.3 See id. at 1. Subsequent to the giving of this notice, the parties proceeded to employ counsel to draft the papers to complete the transaction. Pltf's Opp. at 16.

Thereafter, Lee School unilaterally engaged in a number of activities that were designed to bring the condominiums to the open market, including: (1) submitting a condominium-registration application to the Commonwealth of Virginia Real Estate Board in April 2008; (2) preparing marketing materials for the condominiums; (3) accepting deposits for the purchase of the units; (4) extending the Principal loan, which generated a higher interest rate and escrow fees; and (5) agreeing to the payment of loan-extension fees. See Defs' Mot. at 9-13. This unilateral activity allegedly resulted in both a significant loss of potential income and higher loan payments. See id. At the present time, the project remains unconverted to condominium status and the individual housing units are being rented as apartments.

---

3 Although this proposed buyout may initially appear to be eminently unfair to the Defendants, there is some evidence that the Defendants received significant federal tax credits as a result of the development deal, which exceeded the cost of their investment. Miller Decl. at 7.

By the middle of May 2008, the Defendants had still not closed on the sale of their partnership interests.   On July 7, 2008, Lee School filed this action, demanding that the Defendants convey their partnership interests to Lee School at the price dictated by the formula contained in § 7.4(I) of the LPA.4   See Amend. Compl. at ¶ 42-44.

The Defendants have filed a Motion for Summary Judgment (Docket No. 58) seeking summary judgment on Counts I, II and V of the Amended Complaint, as well as on Counts I and III of their counterclaim.   This Motion has been fully briefed by the parties and is now ripe for decision.

## DISCUSSION

### I.   The Standard For Assessing A Motion For Summary Judgment Under Fed. R. Civ. P. 56(c)

Summary judgment is appropriate where there is no genuine issue as to any material fact.   See Fed. R. Civ. P. 56(c).   Once a motion for summary judgment is properly made

---

4 Lee School also argues that the Defendants have a "duty" to sell their partnership interests "because the parties made a separate agreement in 2008 to this effect."   Pltf's Opp. at 7.   However, the Amended Complaint contains only three counts against the Defendants. Count I seeks to reform the option provision in the LPA due to the mutual mistake of the parties in drafting the option provision.   Amend. Compl. at ¶ 49.   Count II seeks specific performance of the option provision "as reformed."   Id. at ¶ 52.   Count V alleges an alternative breach of contract in the event that the Defendants "refuse to perform their obligations under the Purchase Option and remain in breach thereunder."   Id. at ¶ 62.   None of these claims allege that the parties made a separate agreement in 2008 to convey the partnership interests.   Furthermore, Lee School fails to provide sufficient documentation of this assertion.   Therefore, this issue is not relevant to the pending proceedings and summary judgment is granted on this point.

and supported, the opposing party has the burden of showing that a genuine dispute exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). A material fact in dispute appears when its existence or non-existence could lead a jury to different outcomes. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party. See id.

Summary judgment is appropriate when, after discovery, a party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When a motion for summary judgment is made, the evidence presented must always be taken in the light most favorable to the non-moving party. See Smith v. Virginia Commonwealth Univ., 84 F.3d 672, 675 (4th Cir. 1996). A party cannot, however, "create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Accordingly, the party who bears the burden of proof at trial cannot survive summary judgment without sufficient evidence to sustain its burden of proof

on that point.   Celotex Corp., 477 U.S. at 327.   These
standards govern the resolution of the Defendants' Motion.

## II.   Summary Judgment On Count I

In Count I of the Amended Complaint, Lee School avers:
"The   parties   []   *by   mutual   mistake*   having   executed
provisions of the LPA relating to the right of [Lee School]
to purchase the limited partnership interests of [the
Defendants] failed to reflect the actual agreement of the
parties as reflected by and in the [Investment] Agreement."
Amend. Compl. at ¶ 49 (emphasis added). Lee School argues
that "[t]he Court sitting as chancellor in equity may and
should reform the LPA to reflect the actual agreement of
the parties with respect to the purchase option held by
[Lee School] as general partner."   Id.   Accordingly, Lee
School requests that the first sentence of § 7.4(I) of the
LPA be reformed by adding to the existing text the
underscored language below:

Subject to compliance with Section 47 of the Code
and the rules of the agency, upon completion of
the   Compliance   Period,   the   Managing   General
Partner shall have the option to purchase the
interest of the Investor Limited Partner and
Special Limited Partner No. 1 in the Partnership
*and* the real estate, fixtures and personal
property comprising the Apartment Complex (the
"Option") for a period of twenty-four (24) months
following the close of the Compliance Period as
determined by the Code.

11

Id. at ¶ 49, 50 (emphasis added). The remaining text of §
7.4(I) would be otherwise unchanged from that which is
currently contained in the LPA. See id.

Lee School argues that the proposed reforming text was
deleted from § 7.4(I) of the executed LPA by a mutual
mistake of fact as a consequence of a scrivener's error.
With this in mind, the Defendants contend that they are
entitled to summary judgment on Count I for two reasons:
(1) Lee School cannot use the Investor Agreement between
itself and Paramount as the basis to show a scrivener's
error in the LPA, which is a later-executed agreement
between different parties, to wit: Lee School and the
Defendants; and (2) any error in the option provision of
the LPA was not the result of a scrivener's error but of
Lee School's "inadvertence." Defs' Mot. at 17.

In the Amended Complaint, Lee School alleges that
"[b]ecause of a scrivener's error, the option provision in
the LPA did not reflect the agreement of the parties as
expressed in the October 31, 2001 [Investor Agreement]
between the Partnership and Paramount." Amended Compl. at
¶ 17. However, the Amended Complaint also asserts that Lee
School is alleging that the omission of the requested
inclusion in § 7.4(I) of the LPA was due to a *mutual
mistake* on behalf of the parties. See Amend. Compl. at ¶

49 ("The parties by mutual mistake having executed [relevant] provisions of the LPA"). At oral argument, Lee School took the position that it seeks reformation on the basis of both a mutual mistake and scrivener's error. To a certain extent, these theories are contradictory. As Lee School sees things, however, they are not. Hence, it is best to individually address the asserted scrivener's error and the claimed mutual mistake of fact.

## A. Scrivener's Error

"The correction of a scrivener's error is a court-sanctioned action reforming a contract or other document." Westgate at Williamsburg Condo. Ass'n v. Philip Richardson Co., 270 Va. 566, 575 (2005). In Wellmore Coal Corp. v. Harman Mining Corp., 264 Va. 279, 283 (2002), the Supreme Court of Virginia defined scrivener's errors as those errors in the content of a document which are "demonstrably contradicted by all other documents." Id. Significantly, scrivener's errors are only those errors that "can be proven without parol evidence." Id. at 576.

It is well settled that a court is not permitted to rewrite a document or to add terms not included by the parties. See, e.g., Bentley Funding Group, L.L.C. v. SK&R Group, L.L.C., 269 Va. 315, 330 (2005) (court cannot alter the provisions of or add to the plain language of a

contract). A scrivener's error presents an exception to this general prohibition because scrivener's errors "are difficult to prevent, and . . . no useful social purpose is served by enforcing . . . mistaken terms." Westgate, 270 Va. at 576 (citing S.T.S. Transport Service, Inc. v. Volvo White Truck Corp., 766 F.2d 1089, 1093 (7th Cir. 1985)). Yet, because a change to a document due to scrivener's error presents a "significant exception" to the general rule, courts must narrowly construe the exception. Westgate, 270 Va. at 575.

Lee School has presented no evidence of a scrivener's error. There is nothing that is "readily apparent" on the face of § 7.4(I) of the LPA which reveals a scrivener's error. See Wellmore Coal Corp., 264 Va. at 283. Indeed, the record before the Court demonstrates that the executed version of the LPA reflects the meticulous editing efforts of the parties throughout the drafting process. Hence, Lee School clearly has failed to satisfy the high evidentiary burden for reformation based on scrivener's error. Therefore, summary judgment will granted on this aspect of Count I.

## B. Mutual Mistake

The Defendants also challenge Lee School's assertion that the proffered omission in § 7.4(I) of the LPA was due

to a "mutual mistake." See Defs' Mot. at 18. Primarily, the Defendants contend that Lee School's request for reformation stems only from its "inattention to detail" and does not represent a "mutual mistake" between the parties. Id. at 19 (citing Westgate, 270 Va. at 578).

"Equity has undoubted jurisdiction to reform an instrument if it does not express the intent of the parties. Equity should give effect to the true intent of the parties, despite a contrary intent reflected by a writing the parties mistakenly believed to monument their bargain." Gibbs v. Price, 207 Va. 448, 449-50 (1966). Accordingly, "[t]he equitable remedy of reformation provides relief against a mistake of fact in a written instrument . . . where the mistake is mutual, that is, where both parties sign an instrument mistakenly believing it reflects their antecedent bargain." Ward v. Ward, 239 Va. 1, 5 (1990). And, "equity has jurisdiction to reform written instruments [w]here there has been an innocent *omission or insertion* of a material stipulation, contrary to the intention of both parties, and under a mutual mistake.") (emphasis added). Bankers Fire Ins. Co. v. Henderson, 196 Va. 195, 203 (1954).

Importantly, parol evidence may be used to show the intent of the parties and thereby demonstrate that a mutual

15

mistake of fact has occurred. See id. (citing Boone v. Scott, 166 Va. 644, 653 (1936)). Nevertheless, "[t]o support reformation on the ground of mutual mistake," the proof "must be clear and satisfactory, leaving but little, if any, doubt of the mistake."5 Gibbs, 207 Va. at 450.

Primarily, the Defendants demonstrate that § 7.4(I) of the LPA went through a number of draft stages, where it was carefully reviewed and edited by counsel for the parties. Throughout this process, the challenged language of the LPA remained intact. Defs' Mot. at 20. Moreover, "the parties amended the LPA in 2003 to correct various mistakes, including a mistake in the option provision. Id. Even then, however, [Lee School] left intact the description of the interest in that provision." Id. This evidence militates in favor of concluding that there was no mutual mistake during the drafting process.

Nevertheless, when viewing the legitimate inferences from the current record in the light most favorable to Lee School, it is apparent that the Defendants' Motion for Summary Judgment must be denied on this aspect of Count I.

---

5 The Defendants make reference to this "exacting" standard of proof and claim that Lee School has failed to meet this burden. Defs' Mot. at 7, 11. This argument, however, fails to account for the fact that the requirements for meeting this controlling burden of proof are somewhat tempered when assessing a motion for summary judgment, wherein all inferences inhere to the benefit of the non-moving party. See Archer v. Town of Houlton, 2001 U.S. Dist. LEXIS 14163, at *36 (D. Me. Sept. 12, 2001) ("[R]igorous standards must be tempered by the rules applicable to evaluation of motions for summary judgment.").

Significantly, subsequent provisions of § 7.4(I) evince an intent to execute a valid option agreement. Notably, § 7.4(I)(i) provides, in relevant part, that "[t]he Option Price shall equal the greater of (i) the fair market value of the Investor Limited Partner's and Special Limited Partner's interest, in the Partnership as determined by . . . ." See LPA at § 7.4(I)(i). That language reflects that Lee School was given the option to buy some interest that carried the price of the limited partners' "interest in the partnership." See id. It is plausible that all of the parties to the LPA believed that this "interest" was the Defendants' interest in the Partnership. Furthermore, the fact that the phrase "in the partnership" is explicitly used § 7.4(I)(i) lends some credence to Lee School's assertion that this phrase was mistakenly omitted from § 7.4(I). Taking this evidence in the light most favorable to Lee School, which must be done at this juncture, summary judgment must be denied as to this issue.6 Id. at 12.

---

6 As an additional argument for reformation, Lee School argues that because the plain terms of the unreformed option provision do not permit Lee School to purchase the Defendants' interests under established Virginia law, the parties could not have intended to draft such an agreement. Id. at ¶ 19 ("Under the Virginia Uniform Partnership Act, Va. Code § 50-73.105 . . . '[a] partner is not a co-owner of partnership property and has no interest in partnership property which can be transferred, either voluntarily or involuntarily.' Accordingly, as executed by the parties, the LPA granted [Lee School] as general partner the right to purchase the interest of [the Defendants] in the specified Partnership Property, which interest *does not exist under Virginia law*.") (emphasis added).

### III. Summary Judgment On Count II

In Count II, Lee School requested the Court to compel the Defendants to convey their partnership interests to Lee School at the price dictated by the formula contained in the LPA. See Amend. Compl. at ¶ 54. "The decision whether to award specific performance of a contract rests in the sound discretion of a trial court; it is not a matter of right." Cangiano v. LSH Bldg. Co., 271 Va. 171, 179 (2006); accord Shepherd v. Davis, 265 Va. 108, 124 (2003). Specific performance "may be granted or refused under established equitable principles and the facts of a particular case. The [Court's] discretion must be exercised with a view to the substantial justice of the case." Chesapeake Builders v. Lee, 254 Va. 294, 300 (1997) (citations omitted).

Accordingly, the Defendants contend that specific performance is not appropriate for three reasons: "(1) [Lee School's] claim is predicated on its failed bid to 'reform'

---

The Defendants, however, claim that Lee School "misreads" Va. Code § 50-73.105, as this section "does not prohibit shared ownership arrangements between a partner and a partnership," but is rather a default provision that was overridden by § 7.4(I) of the LPA. See Va. Code § 50-73.81(A). The relevant statutory provisions appear to support the Defendants' position on this point. But, the Court has been unable to locate any precedent addressing this issue. Given the foregoing analysis, however, which finds a sufficient factual dispute respecting the existence of a mutual mistake wholly apart from this argument, the resolution of this issue is unnecessary on summary judgment. Nevertheless, the parties must be prepared to address this issue at trial.

18

the LPA; (2) the LPA does not provide [Lee School] a clear right to exercise the option provision for $0; and (3) the option price is dependent on the need for further agreement between the parties and is thus not enforceable through specific performance." Defs' Mot. at 24. The first of those arguments is entirely dependent on the foregoing analysis respecting Lee School's reformation claim and does not warrant further discussion. The Defendants' two additional arguments, however, require further examination.

## A. Whether There Is A Clear Right To Set The Option Price At $0

Section 7.4(I) of the LPA sets forth the formula by which Lee School can exercise the option to purchase the Defendants' partnership interests. The option provision provides:

> The Option Price shall equal the greater of (i) 100% of the *fair market value* of the Investor Limited Partner's and Special Limited Partner No. 1 interest, in the Partnership *as determined by the value of the interest if the Project owned by Partnership was sold for an amount equal to nine (9) times (determined based on appraisal information and the representation of the Managing General Partner of Partnership that a capitalization rate of 11% is reasonable for comparable sales) its projected net operating income, as mutually agreed to*, . . . .

Id. (emphases added). Pursuant to the above-emphasized language, the Defendants make two arguments.

19

### i. Fair Market Value

The Defendants claim that, under the text of the option provision, the option price must equal "100% of the fair market value of Amtax's and Protech's interests." Defs' Mot. at 25. Thus, the Defendants argue that this provision "confirms that the option price is, indeed, to reflect fair market value" based on *current* market conditions. See id.

It is incontrovertible that, when the terms of a contract are clear and unambiguous, a court is required to construe the terms according to their plain meaning. Bridgestone/Firestone v. Prince William Square, 250 Va. 402, 407 (1995); Foods First, Inc. v. Gables Associates, 244 Va. 180, 182 (1992); Winn v. Aleda Const. Co., 227 Va. 304, (1984). Hence, "[t]he guiding light . . . is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." Magann Corp. v. Electrical Works, 203 Va. 259, 264 (1962).

The language of § 7.4(I) of the LPA does make reference to the payment of a "fair market value" for the Defendants' partnership interests. However, § 7.4(I) also defines the phrase "fair market value" through the use of a

specific formula.  See LPA § 7.4(I) ("the fair market value
 . . . in the Partnership *as determined by* . . . .")
(emphasis added).  Lee School argues that the content of
the phrase "fair market value" was fixed at the time of
execution through the formula contained in the explanatory
parenthetical.  This argument is not implausible in light
of the past-tense language contained in § 7.4(I)(i).  On
the other hand, this language is somewhat ambiguous, and
there is a genuine dispute of material fact respecting
whether the meaning of this phrase was fixed at the time of
the execution of the LPA.  Accordingly, the Defendants'
argument for summary judgment will be denied on this point.

### ii. The Use Of The 9x Multiplier And The 11% Capitalization Rate

The Defendants next contend that "while the option
provision does reference a 9 multiplier, that reference is
subject to an important qualifier that limits its use -
namely, the [parenthetical] that immediately follows the
reference to the 9 multiplier.  That parenthetical permits
use of a multiplier based on two things - first, appraisal
information and second, a representation of [Lee School]
that a 11% capitalization rate is reasonable for comparable
sales when the option is exercised."[7]  Defs' Mot. at 22.

---

7 A "capitalization rate" is used in conjunction with an investment
property's net operating income to determine the property's value.  The

The Defendants treat the text of the parenthetical as providing certain "conditions precedent" for the use of the 9x multiplier. However, there is no language in § 7.4(I) explicitly providing for any change to this multiplier over time, and there is no language explicitly making the 9x multiplier contingent on or subject to future market forces. See LPA § 7.4(I). Specifically, Lee School contends that the parenthetical language in § 7.4(I)(i) explains the derivation of the 9x multiplier at the time that the LPA was drafted in 2001. As Lee School argues, "[i]f the actual market data at the time of option exercise were to be controlling (meaning the 9x multiplier would come into effect only if there were a coincidence between that multiplier and market conditions at the time of the exercise of the option) . . . then there would have been no purpose in fixing the multiplier at 9x net earnings."8 Pltf's Opp. at 10. If the trier of fact were to accept this not-implausible argument, it would be irrelevant whether the Defendants' "appraisal supports the use of an 11% capitalization rate." See Defs' Mot. at 15. Here too,

_____

rate is a measure of the ratio between the net operating income produced by an asset and its capital cost (i.e., the original price paid to buy the asset) or, alternatively, its current market value.

8 Robert Miller offers testimony this effect in his unsworn declaration. In light of Miller's admission that he was uninvolved in the drafting of the LPA, however, his testimony is not probative of this issue. See Pltf's Opp. at 5 (admitting "Undisputed Fact" No. 27).

it appears necessary to discern the intent of the parties on this issue. Therefore, summary judgment is not appropriate on this basis.

**B. Whether The Option Price Is Dependent On Further Agreement**

As explained above, the option provision of the LPA provides that Lee School may purchase the partnership interest of the Defendants at "an amount equal to nine (9) times . . . its projected net operating income, *as mutually agreed to*, for the twelve months during which the Managing General Partner gives notice of its intent to exercise this option." LPA § 7.4(I) (emphasis added). With this in mind, the Defendants further contend that "[y]et another reason why [Lee School] is not entitled to specific performance is the open-ended nature of the pricing formula in the option provision." Defs' Mot. at 25. Specifically, the Defendants contend that the Court cannot compel the parties to reach an "agreement to agree" upon a price in an option clause, and that "there is no agreement between the parties regarding the project [sic] net operating income for the purposes of computing the option price." Id.

"It is an elementary principle that a court of equity will not specifically enforce a contract unless it be complete and certain. All the essential terms of the

contract must be finally and definitively settled. None must be left to be determined by future negotiations." Newcom Holdings Pty. Ltd. v. Imbros Corp., 369 F. Supp. 2d 700, 708 (E.D. Va. 2005). Where the agreement is not a "contract of sale in its true sense, but a mere option," however, a different standard applies. Rolfs v. Mason, 202 Va. 690, 695 (1961).

Specifically, "[o]ption agreements have generally been held or recognized to be sufficiently definite as to price to justify their enforcement if either a specific price is provided for in the agreement or a practicable mode is provided by which the price can be determined by the court without any new expression by the parties themselves." Brown Enters., Inc. v. Hockman, 50 Va. Cir. 237, 239-40 (Warren County 1999). "In all contracts of sale . . . the price is, of course, a material term. It must either be fixed by the agreement itself, or means must be therein provided for ascertaining it with certainty. In the absence of such provision, either stating it or furnishing a mode for fixing it, the agreement would be plainly incomplete, and could not be enforced . . . ." Mason, 50 Va. at 240 (1961) (dictum). "If an objective method to determine the price is provided for in the agreement . . . then the contract is sufficiently definite to be enforced."

Brown Enters., 50 Va. Cir. at 239.

In this case, Lee School argues that it is not seeking to enforce an invalid "agreement to agree." Pltf's Opp. at 16. To this end, Lee School proffers the declarations of Robert Miller ("Miller"), the principal of Lee School, and Jane Sper, Esq. ("Sper"), the attorney retained by Miller to execute the purchase option. Id. In their declarations, Miller and Sper state that the parties had agreed on the "projected net operating income" for the project, as required by § 7.4(I), at the time that Lee School sought to exercise the purchase option. Id.

In making this point, Sper cites the March 2008 letter to Capmark's general counsel, where the "projected net earnings" of the project were calculated by Lee School. Sper Dec. at 2. When presented with this projected net operating income, Capmark raised no issue. Id. Instead, through Capmark, the Defendants retained outside counsel, who, according to Lee School, evinced an intent to execute the transaction in that outside counsel likewise raised no issue or question regarding these numbers. Id. Additionally, operating on the presumption that the Defendants had consented to its calculation, Lee School obtained lender consent to the transaction. Pltf's Opp. at 18. Indeed, it is apparent that the first time that any

issue was raised respecting the projected net earnings of the project was in a June 2008 email to Miller, after the management of the partnership interests had been transferred to Wentwood. See id.

Viewing this sequence of events in the light most favorable to Lee School, there is a dispute of material fact as to whether the parties' seemingly cooperative course of conduct indicated a mutual agreement on the "projected net operating income" of the project at the time that Lee School sought to exercise the purchase option. Cf. Corrosion Coatings, Inc. v. Carboline Co., 636 F. Supp. 844, 847 (S.D. Ohio 1986) (denying summary judgment when "a unilateral offer to modify the terms of an agreement was extended to plaintiffs, to which they accepted by silence"). If there was such a mutual agreement, then the terms of the option provision may be enforceable. At trial, Lee School will, of course, have to prove the existence of such agreement. Nevertheless, because of this material dispute, summary judgment is inappropriate on this issue.[9]

---

[9] Lee School also makes the argument that, because "the limited partners failed to express any disagreement with [its] projections within a reasonable time" they "should be deemed to have waived any disagreement" to the projected net operating income, as calculated by Lee School. Pltf's Opp. at 18. In light of the Court's denying summary judgment on the basis of the argument detailed above, consideration of this argument is unnecessary at this time.

## IV. The Asserted Misconduct Of Lee School

Finally, the Defendants contend that Lee School's misconduct bars its requested relief under both Counts I and II. Specifically, the Defendants assert that Lee School has: "(1) caused the Partnership to violate the City's special use permit; (2) squandered a profitable opportunity for the Partnership resulting in the loss of millions of dollars; and (3) caused the Partnership to lose thousands of dollars by paying exorbitant fees to the Partnership's lender by failing to timely convert the rental units to condominiums and paying off the loan." Defs' Mot. at 26, 27.

Virginia has long required that a party "who asks equity must do equity." Barnett v. Cloyd's Executors, 125 Va. 546, 555 (1919). The Defendants argue that this burden applies with particular force in this matter because Lee School explicitly agreed that it "shall have fiduciary responsibility for the safekeeping and use of all funds and assets of the Partnership" and that it "shall not employ, or permit another to employ, such funds or assets in any manner except for the exclusive benefit of the Partnership." LPA § 7.4(F). Lee School also agreed not to "contract away the fiduciary duty owed at common law to the Limited Partners." LPA § 7.4(G).

27

Moreover, wholly apart from the duties of loyalty enumerated in the LPA, a general partner always owes the fiduciary duties of loyalty and care to its limited partners. Va. Code §§ 50-73.29, 50-73.102(A). The general partner's duty of loyalty extends to "any property, profit, or benefit derived by the partner in the conduct . . . of the partnership business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity." Va. Code § 50-73.102(B)(1). Accordingly, the general partner must "refrain from dealing with the partnership in the conduct of the partnership business as or on behalf of a party having an interest adverse to the partnership," and must also "refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership." Va. Code § 50-73.102(B)(1), (2). A general partner's duty of care to the partnership and its limited partners includes refraining from "engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." Va. Code § 50.73-102(C). And, a general partner must "exercise any rights consistently with the obligation of good faith and fair dealing." Va. Code § 50-73.102(D).

In view of these basic legal precepts, the inequitable conduct in which Lee School allegedly engaged might very well bar any requested equitable relief. However, at present, there are several disputed issues of fact respecting the Defendants' necessarily fact-specific allegation of inequitable conduct. First, Lee School states that it failed to convert the project into condominiums prior to the November 2007 deadline in order to avoid the "significantly higher assessment value" which would be imposed on a condominium complex as opposed to an apartment building. See Miller Dec. at 6. That may or may not have been Miller's true motivation. Nevertheless, based on Miller's proffered justification for his actions, this conduct might not have been done in a manner that was actually "adverse" to the Partnership.10 Id.

Additionally, Lee School contends that because of the required escrow payments due to Principal as a result of the Partnership's failure to convert the complex to condominium units by November 2007, the terms of the loan agreement did not permit it to sell individual condominium units. The borrower's covenants in the Principal Deed of Trust provide that the Partnership was "not permitted to

10 Moreover, Miller asserts, and provides documentation to demonstrate, that he obtained a letter from the City of Richmond in February 2009 waiving any zoning violations.

sell, assign, transfer, or convey any such condominium units established so long as any Indebtedness under the Loan Documents remain[ed] unpaid." Pltf's Opp. 19, 20. Relying on this provision, Miller asserts the following:

> [T]he Principal loan documents would not permit us to sell any individual condominium units, so I did not see any advantage to us in completing the formal condo conversion in 2007. *The extra payments to Principal [as a result of the failure to convert by November 2007] were escrow payments we would get back when the principal loan was repaid. The partnership would save much more money in real estate taxes than the lost interest on the escrow payments.*

Miller Dec. at 6 (emphasis added). Thus, Lee School contends that, "because the Principal loan documents preclude[d] the sale of individual condominium units, [] there was no partnership opportunity in 2007, in 2008, or so far in 2009 that was or could have been 'squandered' or 'appropriated.'" See Pltf's Opp. at 19. Although this assertion is strongly contested by the Defendants, see Defs' Reply at 20, these documented averments create a genuine dispute of material fact on this issue.

Finally, the Defendants claim that Lee School failed to timely pay off the Principal loan, which was due on July 31, 2008, and that Lee School unilaterally obtained three "loan extensions" that were costly to the Partnership.

Defs' Mot. at 29. This issue, however, is laden with factual disputes.

The Defendants have made a forceful case that inequitable conduct bars the relief sought by Lee School. However, there are genuine disputes of material fact on each of the Defendants' points. Therefore, summary judgment is denied on the issue of inequitable conduct.11

### CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment (Docket No. 58) is granted in part and denied in part.

It is so ORDERED.

_____ /s/ _____ _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May 4, 2009

---

11 The Defendants have also requested summary judgment on Counts I and III of their counterclaim against Lee School. Defs' Mot. at 30. The Defendants' arguments for summary judgment on these claims, however, are entirely predicated upon this Court granting summary judgment on Counts I, II, and V of Lee School's claims. Therefore, this argument is subsumed by the foregoing analysis.